JONES, Justice:
Appellant was indicted for murder at the May 1969 term of the Circuit Court of Lee County. On trial therefor, he was convicted of manslaughter and was sentenced to twenty years in the penitentiary; and this appeal results. We affirm.
Mr. John Price, a highway patrolman, was the first witness. As he approached the scene of the death, which occurred in sight of Taylor’s Grocery Store in Macedonia, Mr. Price could see a 1957 Ford car parked at an angle to the ditch, the road running northeasterly toward the store. The right rear of the car was in or near the ditch; the left front was on the road; and the rear wheels appeared to have spun. On the pavement, adjacent to the left front door of the angled car was a body; and a man (the appellant) was leaning over the body.
After parking, Price walked over to Dillard, who was on his knees, asking for help in a loud voice. Shattered glass was on the pavement; a hole was in the car window on the driver’s side; and the victim, who Price later learned was Dillard’s wife, was lying lengthwise from and on the left-hand side of the car, something having intruded on the right lower part of her lip and the back part of her head (the left top) having been shot off. Although he was within three or four feet of her, Price did not see any powder burns. Mr. Price called the sheriff’s unit on his radio and asked them to rush.
Two deputy sheriffs, Billy Joe Hill and Mitchell Moore, arrived at the scene; and Mr. Price assisted them in getting Dillard into their car. Price and Hill then returned to the 1957 Ford, opened the door, and saw a rifle lying on the car floor. Price said that it looked like a high-powered rifle, and that blood was on it. Inside the car was what the witness termed brains and blood spattered all over the front seat, all over the windshield and on the gun and the barrel thereof. It was learned that the gun which was lying on the floorboard between the driver’s and the passenger’s side and which was pointed toward the driver was a 30-30 rifle. Gunpowder could be smelled, and it was Price’s opinion that the rifle had been fired within ten or fifteen minutes. There were no residences at the scene where the killing occurred; but there were houses and buildings only a short distance from the scene, the place of the occurrence being approximately 220 yards from Taylor’s Store and being plainly visible from the front of the store.
Price asked Dillard what had happened, and all Dillard, who appeared to be drunk, would say was “Help! Help!” Dillard had blood and meat fragments all over him, especially on his left side and his hands.
That same afternoon, Price went to the hospital, where he took several pictures of the victim, showing the injuries *889 and bleeding on her face. Objection was made that the pictures had no probative value and would tend to prejudice the jury; and that no proper predicate had been laid, the pictures having been offered during the direct examination of Price. After examination of the pictures by the trial judge, the objections were overruled; and we think rightfully so.
Mr. Morgan Taylor operated Taylor’s Grocery near the scene. He testified that Mr. and Mrs. Dillard came by his store a little before noon; that Mrs. Dillard was driving a 1957 Ford; and that Mr. Dillard had some 30-30 cartridges. Mr. Taylor could not tell whether Mrs. Dillard was drinking; but when Dillard and his wife left the store, she was driving. He saw them again about one p. m., and she was driving. Mr. Taylor did not see her after that.
Between three and four o’clock, Mr. Grisham came by the store with a Mr. Bailey and Dillard in the car. Taylor asked Dillard what had happened and he said, “My wife killed herself, so help me”; and he had his hands up in the air. Mr. Dillard had blood on his hands and sleeves. Taylor called for police and an ambulance. When Taylor returned, Dillard had left and had gone to his car. Taylor saw him as he reached the left front door of the car, and saw him and his wife going onto the pavement together. Taylor went to the scene. A man, Mr. Miller, was there. Taylor said, “She’s dead.” Dillard said, “Don’t say that, don’t say that — she’s not dead.” Dillard was irrational when Taylor last saw him that day.
There was a big place on the side of the deceased’s head. The left front door glass of the car had a hole in it, the bullet hole being located about the middle part of the glass — up toward the top; and there was a little stuff on the glass inside. The front seat was covered with blood. Taylor did nothing to the windows or the car. Taylor later traced the car tracks which had left the road from 100 to 200 feet back and had returned to the road at the place where the car was stopped.
Morris Grisham saw Dillard near the church; Dillard had his hands over his head, saying, “Help! My wife have killed herself.” Blood was on Dillard’s left side pocket and hands. He carried Dillard to Taylor’s store, and when he went into the store, Dillard went back to his car. Luke Bailey was in the car with Grisham.
Mitchell Moore, deputy sheriff, went with Billy Joe Hill, another deputy, to the scene. They saw the car in the ditch and a body on the ground. Dillard was over the body. Johnny Price and a man, Miller, were there. The body was out on the road. Moore arrested Dillard and put him in his car. Dillard had the odor of whisky on him and was not himself. A large amount of blood was on Dillard’s clothes. Moore also saw a rifle in the car, a lot of blood in the car, and a purse and one shoe on the floor. Moore also testified that the car window on the left side had what appeared to be a bullet hole in it and had flesh splattered around the hole inside the car — brains, flesh or something. Moore found 30-30 cartridges in Dillard’s pocket.
On the way to jail, Dillard said he knew he would be the next to die, but he was going to carry about three with him; and he said, “If she had only listened, but she wouldn’t listen to a damn thing.” Moore had said Dillard was irrational and drunk when he was arrested. On cross-examination before the judge only, he was asked if Dillard was still in the same condition when he was talking. Moore said, “Well, I’d think so, but he might have cooled down a little from what he was.” Dillard’s statements were objected to because of his mental condition at the time, and also because he had not been advised of his constitutional rights.
The proof showed the statements were not elicited by questions, but were purely voluntary and spontaneous; and the court overruled both objections, explaining *890 that counsel would have an opportunity to cross-examine on his condition and the jury could determine what credence to give the statements. The statements and facts were thereupon introduced; and, we think rightfully so.
Billy Joe Hill, the deputy sheriff who accompanied Deputy Moore to the scene, testified essentially as Mr. Moore did.
Although he found no powder burns, Mr. Bill Sides, the coroner, testified that the decedent had been shot in the head, the bullet entering about two inches forward from the right ear and exiting above the left ear.
Don Ates, a Mississippi highway patrol criminologist handling ballistics and blood work in the laboratory, examined and tested the rifle found in the car to ascertain whether it would fire accidentally. The rifle was first checked and put through several tests, which were detailed by the witness. While stating that no expert can say a gun made by human hands cannot malfunction at any one time, Ates testified that in his opinion, it was highly unlikely that the gun had discharged accidentally and stated that the only way it would fire was for the hammer to be cocked and the trigger pulled.
Mrs. Frances Roberts, the mother of decedent, testified that her daughter and Dillard, who lived in the back of witness’ store, were not getting along well because he was' “insanely jealous” of her; and that decedent had planned to get a divorce when court convened. Instances of the manifestations of jealousy were given in addition to the following: an accusation of unfaithfulness had been made by Dillard to his wife; the defendant had stated to the witness that his wife had found somebody else and that if she ever left him, he would hunt her down and kill her; and the defendant had beaten his wife once.
Ben O’Callahan lived in Union County. On the day of Mrs., Dillard’s death, she and the defendant had come to his house about noon. The defendant and his wife were “cutting” at each other. She said it was because she had been late from work one evening and the defendant had accused her of being out with another man. He appeared to be drunk, and he had some 30-30 shells in his pocket. While the witness and the defendant were alone, defendant said, “Junior O’Callahan, I am going to blow my damn brains out and I am going to take her with me.” This was all of the State’s direct evidence.
For the defense neighbors and acquaintances were presented to show that the defendant and his wife were congenial and living together. Testimony was given that Dillard was a hard drinker; that his wife drank; and that he was drunk and irrational the afternoon of the occurrence. One witness also testified that she had passed Dillard’s car at the place of the occurrence and had seen a strange man under the wheel.
Dillard testified. He asserted a great love for and a congenial existence with his wife, and denied his having previously made any threats against her or having had any desire or motive to have her dead. Acknowledging that he and she were engaged in drinking on the day of her death, and asserting a blackout on his part, he claimed that he remembered nothing of what happened from sometime before her injury and death until he “awoke” in jail. He identified the rifle introduced as his. This completes the evidence except for the rebuttal of isolated instances not necessary to be detailed here.
The refusal of a motion for a peremptory instruction for the defendant and the introduction of the rifle found in the car and admitted by the defendant to be his are assigned as errors. These assignments are without merit.
While there is no eyewitness account of what happened immediately before or when the car left the road nor from *891 then until the victim was lying on the pavement, there is sufficient circumstantial evidence to bridge this gap and support the jury’s verdict.
The instructions are not questioned and the case is affirmed.
Affirmed.
GILLESPIE, P. J., and BRADY, SMITH and SUGG, JJ., concur.